# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| DUSTY DAWKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:17-CV-381-HAB |
| | ) | |
| TRUSTEES OF BOSTON UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## **OPINION AND ORDER**

This matter comes before the Court on Defendant Trustees of Boston University's Motion for Summary Judgment (ECF No. 22), filed on April 19, 2019. The proceedings related to Defendant's Motion for Summary Judgment have been marked by delay, resulting from the withdrawal of Plaintiff's counsel and Plaintiff's subsequent failure to retain replacement representation. Those delays culminated in this Court's denial of Plaintiff's latest request for additional time to respond to Defendant's Motion. (*See* ECF No. 38). With no timely response having been filed, Defendant's Motion for Summary Judgment is now ripe for determination.

**A.      Factual Background**

Plaintiff has alleged that Defendant violated Title III of the Americans with Disabilities Act (the "ADA") and Section 504 of the Rehabilitation Act of 1973 and has also alleged state court claims for breach of contract, promissory estoppel, and negligence arising out of his termination from Defendant's online Master of Social Work program (the "Program"). Plaintiff enrolled in the Program beginning in the Summer I – 2013 term. His goal, as stated in his application, was to help people struggling with addiction since Plaintiff himself was a recovering addict.

A key part of the Program was field work. Plaintiff began his advanced year field work placement at Parkview Behavioral Health ("PBH") in March 2015. Plaintiff had significant issues with absenteeism: from March through June 2015, Plaintiff had at least ten documented absences. As a result, Plaintiff and his supervisor at PBH agreed to an attendance plan whereby Plaintiff's schedule was reduced to two days per week, but Plaintiff agreed not to miss any additional days without notice.

Plaintiff failed to comply with the attendance plan, missing work on June 24, 2015. Plaintiff texted a coworker to say that he had overslept but that he would report to work soon. Plaintiff later texted the same coworker to say that he had fallen back asleep and would not be in at all. As a result of his absence, Plaintiff was terminated from his field placement at PBH. Plaintiff's supervisor at PBH provided Defendant with reports detailing Plaintiff's issues at PBH. Plaintiff did not dispute any of the supervisor's reports.

On June 29, 2015, Plaintiff received a memorandum from Defendant scheduling a Problem Resolution meeting. The memorandum stated that the reason for the meeting was Plaintiff's "inconsistent attendance and lack of communication with his field agency and recent termination from his advanced field placement." The memorandum also noted that Plaintiff had received an "Incomplete" grade in his Family Therapy class due to absences and unsatisfactory performance on assignments. The goal of the meeting was to identify issues that were affecting Plaintiff's performance and to develop a plan for Plaintiff's future participation in the Program.

The meeting occurred on July 10, 2015. At the meeting, Plaintiff disclosed that he had taken leave under the Family Medical Leave Act ("FMLA") from his job in March and April 2015 but had continued with his placement at PBH. Plaintiff acknowledged that he had not properly communicated with PBH regarding his absences but said that things were getting better for him

personally and that he did not anticipate the need for any additional time off. Plaintiff stated that he had been approached by a private practice that offered to allow him to complete his field placement there and then obtain a paid position after graduation. When asked if he needed any additional support from Defendant, Plaintiff said that he did not.

As a result of the meeting, an action plan was developed and set forth in a memorandum summarizing the meeting. Under the plan, Plaintiff would begin a new field placement with a reduced schedule to assist him in reducing his stress. Plaintiff agreed to attend the new placement on the required scheduled days and agreed to increase communication with Defendant for needs and support when issues or concerns arose. The memorandum summarizing the meeting concluded with a warning: "Failure to adhere to a 16 hour per week schedule, completing process recordings and reflection assignments on time will jeopardize the field placement and require referral to a Status Review." (ECF No. 23-1 at 86).

After failing to obtain a placement at his first choice, Plaintiff began his second advanced field placement at the Fort Wayne Rescue Mission. Both Defendant and the Rescue Mission allowed Plaintiff to set his own schedule, but Plaintiff still failed to attend the placement as agreed. Within the first three weeks, Plaintiff had two sick days and had several other events of tardiness or absenteeism. In early January 2016, Plaintiff's supervisor at the Rescue Mission sent a letter to Defendant stating, "Ethically, I would not be able to recommend him for practice in the social work profession at this point in his life. He needs a lot of personal work before he can help others." (ECF No. 23-3 at 11).

Unfortunately, Plaintiff's attendance problems were not confined to his field placement. Plaintiff missed the first live class in his Substance Abuse course and failed to take advantage of an opportunity to make up the class. Plaintiff missed a quiz in his Human Neuropsychology course

3

and, during a subsequent email exchange with the professor, blamed the missed quiz on "a bunch of stressors," but stated that he felt he was "close to getting back on track." (ECF No. 23-2 at 32). On November 2, 2015, Plaintiff missed a live class in his Ethics course. In response to concerned emails from his professor, Plaintiff stated that his absence was due to "a personal reason, and I do not wish to tell you about it, if you don't mind." (*Id*. at 19). Plaintiff's attendance appears to have negatively affected his academic performance, as he failed the first paper in his Ethics course.

On December 9, 2015, Plaintiff was informed that he was being referred to a Status Review Committee Meeting. Referrals to the Status Review Committee were used by Defendant in instances of plagiarism, failure of a required course, or when a previous Problem Resolution meeting had been held but problems continued. Referral to the Status Review Committee can result in dismissal from the Program.

The Status Review Committee Meeting was held on January 26, 2016. During the meeting, Plaintiff disclosed that he had experienced personal issues, including a divorce, the loss of his job, and the loss of his home. Plaintiff also noted that he had a history of drug and alcohol addiction as well as incarceration. He stated that he wished he had not taken the placement at the Rescue Mission. When asked what specific steps he planned to correct these issues in the future, Plaintiff stated that he "just needed to finish" and that it "wouldn't be fair" to dismiss him from the Program. (*Id*. at 62).

On February 1, 2016, Defendant sent a letter to Plaintiff advising him that he had been dismissed from the Program. (*Id*. at 61–62). Defendant relied on what it called "strong evidence" that Plaintiff demonstrated: major gaps in his ability to use appropriate channels of communication to address problems; lack of understanding of the effects of your statements and behaviors on others; uneven ability to use critical thinking to evaluate and apply knowledge and research

findings to professional performance; inconsistent attendance both in live classroom and the field; and erratic and unprofessional behavior in the field. (*Id*. at 61).

Plaintiff submitted an appeal of his dismissal on February 15, 2016. In support of the appeal, Plaintiff provided information regarding his FMLA leave in March 2015, information regarding his divorce and resulting homelessness, and advised Defendant that he had been diagnosed with Borderline Personality Disorder, though no medical documentation was provided. His appeal was denied because most, if not all, of the information provided in the appeal was available to the Status Review Committee when it made its determination. Plaintiff filed a Section 504 grievance on May 3, 2016. That grievance was also denied, as Defendant found that Plaintiff had failed to timely make any requests for accommodations. Plaintiff appealed this determination to the University Provost, and that appeal was also denied.

**B.     Analysis**

**1.     *Summary Judgment Standard***

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Summary judgment is the moment in litigation where the non-moving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). "A district court should deny a motion for summary judgment only when the non-moving party presents admissible evidence

that creates a genuine issue of material fact." *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (first citing *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010); then citing *Swearnigen–El v. Cook Cty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010)).

Material facts are those that are outcome determinative under the applicable law. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008). Additionally, a court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

Defendant is not entitled to summary judgment by default simply because Plaintiff has failed to respond. Instead, the Court "must still review the uncontroverted facts and make a finding that summary judgment is appropriate as a matter of law." *Nabozny v. Podlesny*, 92 F.3d 446, 457 n.9 (7th Cir. 1996).

**2.    *Failure to Accommodate***

The Plaintiff claims that the Defendant violated Title III of the ADA and Section 504 of the Rehabilitation Act when it failed to provide him with a reasonable access, arrangements, services, and benefits, including reasonable arrangements for accessing courses and examinations in school. (ECF No. 1 at 6–7).

The same analysis applies to the Plaintiff's ADA and Rehabilitation Act claims. *See A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018) (noting that courts construe and apply both statutes in a consistent manner because their relevant provisions and implementing regulations are "materially identical"). Section 504 of the Rehabilitation Act provides that no disabled individuals "shall, solely by reason of her or his disability, be excluded

from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The ADA greatly expanded upon the Rehabilitation Act's prohibition on disability discrimination. For example, Title III, which is relevant here, expands protections to places of public accommodation. 42 U.S.C. § 12182(a) ("No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."). The Defendant is considered a place of public accommodation. 42 U.S.C. § 12181(7)(j) (including private postgraduate universities as places of public accommodation).

Title III of the ADA contains a specific provision imposing a duty to provide reasonable accommodations to disabled individuals. *See* 42 U.S.C. § 12182(b)(2)(A)(ii) ("discrimination includes . . . a failure to make reasonable modifications in policies, practices, or procedures"). The ADA contemplates three inquiries: "whether the requested modification is 'reasonable,' whether it is 'necessary' for the disabled individual, and whether it would 'fundamentally alter the nature of'" the privileges of participation being provided. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 n.38 (2001) (quoting 42 U.S.C. § 12182(b)(2)(A)(ii)). Although Section 504 of the Rehabilitation Act does not provide such language, the Supreme Court has recognized a duty to provide reasonable accommodations in Section 504. *See Alexander v. Choate*, 469 U.S. 287, 301 (1985) (noting that "to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made").

In order to establish a claim for failure to accommodate, Plaintiff must show that: (1) he is a qualified individual with a disability; (2) Defendant was aware of his disability; and (3) Defendant failed to reasonably accommodate the disability. *Bunn v. Khoury Enters., Inc.*, 753 F.3d

7

676, 682 (7th Cir. 2014). On the record before the Court, it is undisputed that Plaintiff's claim fails the second prong.

The Court comes to this conclusion based upon the Plaintiff's own statements. In April 2015, Plaintiff told Defendant that he was "on FMLA for a few weeks" and that he thought he was getting divorced, but said "I will be ok though, thanks for asking." (ECF No. 23-2 at 45). During the Problem Resolution meeting, Plaintiff's only complaint was "stress," but he stated that "things are getting better personally" and stated that he didn't need any additional support from Defendant. (ECF No. 23-1 at 84–85). In September 2015, he advised that he had "a bunch of stressors" in his life, but that he was "close to getting back on track." (ECF No. 23-2 at 32). In November 2015, he advised his Ethics professor that he was "doing ok," and declined to give any details regarding his failure to attend class other than to say it was a "personal reason." (*Id.* at 19–20). In December 2015, he said that he was "pretty overwhelmed," but went on to say that he was "not sure there is Much [sic] anyone can do to help." (*Id.* at 25). When he was advised of the referral to the Status Review Committee, Plaintiff stated only that "this year has been terrible." (*Id.* at 24).

Taken together, these statements demonstrate an individual experiencing stress while matriculating through a post-graduate degree program. This is not remarkable. Nor is it remarkable that Plaintiff appears to have had personal matters that affected his academic performance. These are normal life experiences. These are also experiences that Plaintiff repeatedly advised he could handle, and for which he repeatedly turned down offers of assistance from Defendant. Without additional disclosure from Plaintiff, there was no reason for Defendant to believe that any additional accommodations were necessary.

While Plaintiff's actions and complaints could have been symptoms of a larger problem, that is not sufficient to impose liability on Defendant. Speaking in the employment context, the Seventh Circuit has stated:

> Employers fire people every day. Perhaps the most common criterion for choosing whom to fire is which employees perform a job better or worse than others. Allowing liability when an employer indisputably had no knowledge of the disability, but knew of the disability's effects, far removed from the disability itself and with no obvious link to the disability, would create an enormous sphere of potential liability. Tardiness and laziness have many causes, few of them based in illness. The ADA hardly requires that merely because some perceived tardiness and laziness is rooted in disability, an employer who has not been informed of the disability, and who has no reason to know of the disability, is bound to retain all apparently tardy and lazy employees on the chance that they may have a disability that causes their behavior. The ADA does not require clairvoyance.

*Hedberg v. Ind. Bell Tele. Co., Inc.*, 47 F.3d 928, 934 (7th Cir. 1995).

So it is here. Plaintiff's absenteeism and poor performance could have been caused by a recognized disability, but it was equally possible from Defendant's standpoint that any number of non-disability related causes were at work. Again, Plaintiff's own statements are illustrative. Plaintiff stated in November 2015 that he "just spaced" a scheduled call with his professor. (ECF No. 23-2 at 20). He blamed his issues at PBH on the fact that his supervisor was "not willing to provide supervision." (*Id*. at 38). He blamed academic difficulties in June 2015 on the fact that he "slacked off last week." (*Id*. at 37). Plaintiff attributed his failures to non-disability related causes, and it was reasonable for Defendant to accept those attributions.

In summary, Plaintiff did everything he could to portray to the Defendant that he did not suffer from a qualifying disability. He downplayed his issues, made excuses for his failures, and refused repeated offers of help. While he very well may have suffered from a disability, Defendant was not required to be clairvoyant nor was it required to assume a disability where it had been provided no supporting evidence. Therefore, the Court concludes that Defendant was not aware of

any disability that would require accommodations and is entitled to judgment as a matter of law on Plaintiff's failure to accommodate claim.

**3.** *Retaliation*

The Plaintiff further alleges that Defendant "retaliated against him on the basis of his disabilities." (ECF No. 1 at 6). The ADA and the Rehabilitation Act prohibit retaliation for the exercise of rights under those statutes. *See Moraine Valley Cmty. Coll.*, 795 F.3d at 710 (retaliation under ADA); *Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012) (retaliation under Rehabilitation Act). A plaintiff may proceed under either the direct or burden-shifting method of proof to establish this type of claim. *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). "[B]oth methods are directed at the 'fundamental question at the summary judgment stage, which is simply whether a reasonable jury could find prohibited discrimination.'" *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014) (quoting *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014)) (brackets omitted); *see also Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017) (noting that courts consider all evidence on a retaliation claim "to determine whether a causal link exists"). Because the Defendant has offered a legitimate, nondiscriminatory reason for the dismissal, the Plaintiff must produce evidence that the Defendant's reasons were pretext for retaliation. *See Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 596 (7th Cir. 2017) (citing *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017)).

The record demonstrates no evidence that Plaintiff's dismissal from the Program was pretextual. Plaintiff was dismissed from one field placement, and his supervisor at the second could not ethically recommend Plaintiff for a social work position. Plaintiff repeatedly missed classes, exams, and other deadlines. He failed to comply with the action plan developed at the Problem

Resolution meeting. "[P]retext 'involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action.'" *Burton v. Bd. of Regents*, 851 F.3d 690, 698 (7th Cir. 2017) (quoting *Harden v. Marion Cty. Sheriff's Dep't.*, 799 F.3d 857, 864 (7th Cir. 2015)). There is no evidence that Defendant's stated reasons for Plaintiff's dismissal were a lie, and Defendant is entitled to judgment as a matter of law on Plaintiff's retaliation claim.

**4.**   ***State Law Claims***

For the reasons stated above, the Court grants Defendant's summary judgment motion as to Counts I and II. Because that disposition results in the dismissal of all claims over which the Court has original jurisdiction, see 28 U.S.C. § 1367(c)(3), the Court must address whether to retain jurisdiction over the state law claims in Count III and rule on Defendant's motion for summary judgment.

As the Seventh Circuit consistently has stated, "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *see also Williams v. Rodriguez,* 509 F.3d 392, 404 (7th Cir. 2007) ("As a general matter, when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining pendant state claims"); *Wright v. Associated Ins. Cos*., 29 F.3d 1244, 1251 (7th Cir. 1994) ("the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendant state-law claims rather than resolving them on the merits"). Yet the court of appeals has discussed "three well-recognized exceptions" to the general rule that "when all federal-law claims are dismissed before trial, the pendent claims should be left to the state courts." *Wright*, 29 F.3d at 1252. As the court has

explained, occasionally there are "unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point to a federal decision of the state-law claims on the merits." *Id*.

The first example that the court discussed occurs "when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court." *Wright*, 29 F.3d at 1251. That concern is not present here, however, because Indiana law gives a plaintiff three years from the dismissal on jurisdictional grounds of state law claims in federal court in which to refile those claims in state court. *See* Ind. Code § 34-11-8-1.

The second exception recognized in *Wright* applies when "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort." 29 F.3d at 1251 (quoting *Graf v. Elgin, Joliet & E. Ry. Co.*, 790 F.2d 1341, 1347–48 (7th Cir. 1986)). Here, although the Court has devoted significant resources to the disposition of the federal claim on summary judgment, it has not delved deeply into the state law claims. *See Davis*, 534 F.3d at 654 ("the district court disposed of the federal claims on summary judgment, and so 'substantial judicial resources' have not yet been committed to the case"). Thus, while there clearly are instances in which "a district court should exercise supplemental jurisdiction over pendent state law claims for reason of judicial efficiency," *Miller Aviation v. Milwaukee Cty. Bd. of Supervisors*, 273 F.3d 722, 732 (7th Cir. 2001), this is not one of them.

The third circumstance to which the court of appeals has pointed in which disposition of pendent state law claims may be appropriate "occurs when it is absolutely clear how the pendent claims can be decided." *Wright*, 29 F.3d at 1251. For example, "[i]f the district court, in deciding a federal claim, decides an issue dispositive of a pendent claim, there is no use leaving the latter claim to the state court." *Id*. In addition, if the state-law claims are "patently frivolous," they should

be resolved right away in the federal court. *Id*. However, "[i]f the question whether a state-law claim lacks merit is not obvious, comity concerns may dictate relinquishment of jurisdiction." *Id*. This is a close call. The Court believes that Plaintiff's claims are likely without merit, but it ultimately concludes that it cannot say with certainty that they are patently frivolous. While Plaintiff's state court claims arise out of the same facts as his now-defunct federal claims, they are nonetheless subject to distinct legal analysis. Based on the record before the Court, that analysis is simply not possible. While Defendant states that Plaintiff "has not identified any written contract with the University" (ECF No. 23 at 21), there were certainly documents exchanged between the parties during the enrollment process. Those documents have not been designated. In addition, the Court has very little, if any, argument or evidence related to the state law claims. Defendant takes the position that the state law claims rise and fall with the federal claims but has not demonstrated that this is the case. The Court may very well be delaying the inevitable but nonetheless concludes that relinquishment of jurisdiction is appropriate.

In sum, the Court concludes that none of the exceptions to the "usual practice" applies in this case. Accordingly, the Court denies Defendant's motion for summary judgment without prejudice and dismisses Count III with leave to refile in state court.

**C.     Conclusion**

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 22) is GRANTED in part and DENIED in part. Judgment is hereby entered in favor of Defendant on Counts I (Americans with Disabilities) and II (Rehabilitation Act 1973, Section 504) of Plaintiff's Complaint. Defendant's Motion is denied as to Plaintiff's state law claims in Count III; that claim is dismissed without prejudice to refiling in state court.

SO ORDERED October 15, 2019.

                                            s/ Holly A. Brady
                                            JUDGE HOLLY A. BRADY